Field 11/12/13 Raymond C. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAYMOND C. et al., | |
| Petitioners, | |
| v. | G046836 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. Nos. A169785 & 30-2011-00530355) |
| Respondent; | O P I N I O N |
| JOHN C. et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Caryl Lee, Judge. Petition granted; writ issued.

Locke Lord, Jon L. Rewinski, Stephen A. Tuggy and Matthew B. Nazareth for Petitioners.

Farella Braum + Martel, Mark D. Petersen and Alex Reese for California Association of State Hospital Parent Councils for the Retarded as Amicus Curiae on behalf of Petitioners.

Law Offices of Brian D. Rondon and Brian D. Rondon for Parent Hospital Association of Sonoma Developmental Center as Amicus Curiae on behalf of Petitioners.

Law Offices of Christopher A. Poulos and Christopher A. Poulos for Parents Coordinating Council of Lanterman Developmental Center as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Frank Ospino, Public Defender, Mark S. Brown, Assistant Public Defender, and Kira Rubin, Deputy Public Defender, for Real Party in Interest John C.

Enright & Ocheltree, Judith A. Enright and Julie A. Ocheltree for Real Party in Interest Harbor Developmental Disabilities Foundation, doing business as Harbor Regional Center.

William Leiner, Dara Schur, Connie Chu and Monisha Coelho for Disability Rights California and National Disability Rights Network as Amici Curiae on behalf of Real Party in Interest John C.

Michelman & Robinson, Mona Z. Hanna, Jeffrey D. Farrow and Robin James for Association of Regional Center Agencies, Inc., as Amicus Curiae on behalf of Real Party in Interest Harbor Developmental Disabilities Foundation, doing business as Harbor Regional Center.

\* \* \*

Petitioners Raymond C., Carol C., and Andrea C. (collectively, Petitioners), who are coconservators for real party in interest John C.,[1] seek writ relief to prevent the

---

[1] We abbreviate the last name of John and his family members, and will use only their first names, to protect John's privacy. (See Welf. & Inst. Code, § 4502,

2

trial court from conducting an evidentiary hearing on a habeas corpus petition the Orange County Public Defender (Public Defender) filed on John's behalf to obtain his release from Fairview Developmental Center (Fairview). John is a 57-year-old, developmentally disabled adult who has resided at Fairview for more than 47 years due to a series of placements made under the Lanterman Developmental Disabilities Services Act (Lanterman Act; Welf. & Inst. Code, § 4500 et seq.).[2] The Public Defender brought the habeas corpus petition under section 4800 because it contends less restrictive facilities can provide similar care for John and the Lanterman Act mandates placement of developmentally disabled persons in the least restrictive environment capable of meeting their needs. Petitioners contend the Public Defender lacks authority to pursue the habeas corpus petition because they, as John's legal representatives, believe Fairview is the best placement for John.

We agree the Public Defender lacks authority to pursue the habeas corpus petition on John's behalf. Supreme Court precedent establishes that the Public Defender may not pursue a section 4800 habeas corpus petition on a developmentally disabled person's behalf without establishing "'*very exceptional circumstances*'" (*In re Hop* (1981) 29 Cal.3d 82, 86-87 (*Hop*), original italics) and that other available remedies for challenging the placement are inadequate (*In re Gandolfo* (1984) 36 Cal.3d 889, 897-900 (*Gandolfo*)). We conclude very exceptional circumstances are not present in this case and the existing remedies are adequate because John's Fairview placement has been subject to periodic judicial review for nearly 20 years, a hearing on the next periodic

---

subd. (b); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008, fn. 1 (*Susan T.*).) No disrespect is intended.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

review already was scheduled when the Public Defender filed the habeas corpus petition, and the Public Defender failed to show Petitioners are not acting in John's best interest.

Although we agree with Petitioners the Public Defender may not pursue its habeas corpus petition, we do not agree with their contention the Lanterman Act's administrative fair hearing procedures deprive the trial court of jurisdiction to periodically review John's placement. The fair hearing procedures provide the exclusive means for challenging a specific decision to change John's placement or the other services he receives, but those procedures do not prevent the trial court from periodically reviewing whether his developmental center placement is still warranted. In *Hop*, the Supreme Court held that a developmentally disabled person could not be placed in a developmental center under the Lanterman Act without a judicial hearing on whether the person's disabilities warrant placement in the most restrictive environment available. Because placement in a developmental center constitutes a significant restraint on the developmentally disabled person's fundamental liberty interests, the *Hop* court concluded the person's due process and equal protection rights require a judicial determination regarding the suitability of the placement. As explained below, we conclude *Hop*'s rationale also requires periodic independent reviews to ensure the developmentally disabled person's disability continues to warrant placement in a developmental center.

Accordingly, we issue a writ of mandate directing the trial court to (1) enter an order dismissing the habeas corpus petition the Public Defender filed on John's behalf, and (2) proceed with the *Hop* review hearing on John's Fairview placement.

I

LEGAL BACKGROUND

To explain the roles performed by the various persons and entities involved in John's Fairview placement, and to put the parties' contentions in the proper context, we begin by providing an overview of the principal statutory scheme at issue, the

4

Lanterman Act, and two related statutory schemes, the Lanterman-Petris-Short Act (LPS Act; § 5000 et seq.) and section 6500 et seq. These acts authorize confinement of developmentally disabled or mentally ill persons in a state developmental center (also referred to as a state hospital in some statutes) when certain conditions are satisfied. We also summarize the Supreme Court's *Hop* decision and the limits it places on a developmentally disabled person's commitment to a developmental center under the Lanterman Act.

A.      *The Lanterman Act*

"Enacted in 1977, the Lanterman Act establishes a comprehensive scheme for providing services to people with developmental disabilities." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 682 (*Capitol People*).) The Act's stated purpose is to establish "[a]n array of services and supports . . . which is sufficiently complete to meet the needs and choices of each person with developmental disabilities, regardless of age or degree of disability, and at each stage of life and to support their integration into the mainstream life of the community." (§ 4501.)

A "'[d]evelopmental disability'" is "a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual." (§ 4512, subd. (a).) The term includes "mental retardation, cerebral palsy, epilepsy, and autism," but does not include "other handicapping conditions that are solely physical in nature." (*Ibid.*)

The state contracts with private nonprofit corporations to establish and operate a network of 21 regional centers that are responsible for determining eligibility, assessing needs, and coordinating and delivering direct services to developmentally disabled persons and their families. (*Capitol People*, *supra*, 155 Cal.App.4th at pp. 682-683.) The regional centers' purpose is to "assist persons with developmental disabilities and their families in securing those services and supports which maximize

5

opportunities and choices for living, working, learning, and recreating in the community." (§ 4640.7, subd. (a).) The state "allocates funds to the centers for operations and the purchasing of services, including funding to purchase community-based services and supports. [Citations.]" (*Capitol People*, at p. 683.)

"The specific rights of persons with developmental disabilities and the corresponding obligations of the state are determined through an individual program plan (IPP) procedure that meets common statutory requirements. (§§ 4646-4648.) The IPP is developed by a planning team that includes the [developmentally disabled person], his or her legally authorized representative, and one or more regional center representatives. (§ 4512, subd. (j).) The goals and objectives developed through the IPP process should maximize opportunities for the individual to be part of community life; enjoy increased control over his or her life; acquire positive roles in community life; and develop the skills to accomplish the same. (§ 4646.5, subd. (a)(2).)" (*Capitol People*, *supra*, 155 Cal.App.4th at p. 683.)

Before July 1, 2012, a nondangerous, developmentally disabled person could be admitted to a state developmental center in two ways. First, the person could submit a written admission application if he or she "is in such condition of mind as to render him competent to make [the application]." (§ 6000, subd. (a)(1).) Second, section 4825 authorized admission "upon the application of the person's parent or conservator in accordance with the provisions of Sections 4653 and 4803." (See also § 6000.5.) Section 4653 states "no developmentally disabled person shall be admitted to a state hospital except upon the referral of a regional center." Section 4803 provides that a regional center may not recommend admission of a developmentally disabled person to a community care or health facility unless the regional center certifies the person to be admitted or the person's parent or conservator does not object. Section 4825 does not limit the length of a developmentally disabled person's commitment, nor does it require judicial review of the placement.

6

Effective July 1, 2012, the Legislature amended the Welfare and Institutions Code to prohibit nondangerous, developmentally disabled persons from being admitted to state developmental centers.  (§§ 4507, 7505.)  Section 7505 now provides that a person shall *not* be admitted to a state developmental center unless the person is developmentally disabled *and* the person is:  (1) committed by a court to Fairview Developmental Center because the person is a danger to self or others under section 6500 and is suffering an acute crisis as defined in section 4418.7; (2) committed by a court to the Porterville Developmental Center's secure treatment program through the criminal justice system or juvenile court system; or (3) a prior resident of a developmental center who was provisionally released no more than 12 months earlier.

These recent Welfare and Institution Code amendments do not require moving nondangerous, developmentally disabled persons living in a state developmental center on July 1, 2012, to a different facility.  Instead, the amendments require the regional center responsible for the committee to conduct a comprehensive assessment and "identify the types of community-based services and supports available to the [person]." (§ 4418.25, subd. (c)(2)(A) & (B).)  The regional center must then provide the assessment to the individual program planning team to assist it in determining the least restrictive environment for the committee.  (§ 4418.25, subd. (c)(2)(D).)

"[T]he Lanterman Act guarantees an applicant for or recipient of services or his or her representative 'who is dissatisfied with any decision or action of [a regional center or developmental center]' the right to an administrative fair hearing.  [Citation.]" (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1459 (*Whitley*); § 4704.)  The fair hearing procedures are designed to decide "all issues concerning the rights of persons with developmental disabilities to receive services under [the Act]."  (§ 4706, subd. (a).)  The fair hearing procedures include "detailed provisions for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing.  [Citations.]"  (*Whitley*, at

7

pp. 1459-1460.)  If the claimant chooses to proceed to an administrative fair hearing, the Lanterman Act guarantees the claimant a prehearing exchange of potential witnesses and documentary evidence, the opportunity to present witnesses and evidence, the opportunity to cross-examine all opposing witnesses, the right to appear through counsel or other representatives, and a written decision by the hearing officer.  (*Id*. at pp. 1460-1461.)  Either side may seek judicial review of the administrative decision through a writ of administrative mandamus.[3]  (See *In re Michael K.* (2010) 185 Cal.App.4th 1112, 1126 (*Michael K.*).)

B.      *The LPS Act*

        The LPS Act "governs the involuntary treatment of the mentally ill in California."  (*Susan T.*, *supra*, 8 Cal.4th at p. 1008.)  It "is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled."  (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 977.)  A person is "'gravely disabled'" under the LPS Act if the "person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter."  (§ 5008, subd. (h)(1)(A).)  The term

---

        [3]      Amici Curiae Disability Rights California and National Disability Rights Network requested that we judicially notice (1) a Web site printout providing the historical populations of California's state developmental centers; (2) the California Department of Developmental Services' Quarterly Client Characteristics Report from December 2012; and (3) testimony by the mother of a developmentally disabled adult from an April 27, 2010 Joint Oversight Hearing before the Assembly Committee on Human Services and the Assembly Select Committee on Disabilities regarding the "Final Report on Closure of Agnews Developmental Center:  Keeping the Promise of the Lanterman Act."  We deny the request because these documents are irrelevant to whether the Public Defender is authorized to bring a habeas corpus petition under section 4800 and whether *Hop* authorizes the trial court to periodically review developmental center placements under the Lanterman Act.  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 (*Mangini*) ["Although a court may judicially notice a variety of matters [citation], only *relevant* material may be noticed" (original italics)], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

"does not include mentally retarded persons by reason of being mentally retarded alone." (§ 5008, subd. (h)(3).)

When probable cause exists to believe a mental disorder makes a person "a danger to others, or to himself or herself, or gravely disabled," the LPS Act authorizes a peace officer or certain mental health professionals to detain the person for a 72-hour treatment and evaluation period. (§ 5150.) Following that period, the person may be detained for increasingly longer periods depending on the results of the initial evaluation and treatment. (See, e.g., § 5250 [additional intensive 14-day treatment period if person remains "a danger to others, or to himself or herself, or gravely disabled"]; § 5260 [second intensive 14-day treatment period if the person is suicidal]; § 5270.15 [additional 30-day treatment period if person remains gravely disabled, he or she is unwilling to voluntarily accept treatment, and the county board of supervisors authorized 30-day treatment periods]; § 5300 [additional 180-day commitment if person is imminently dangerous]; § 5304, subd. (b) [second 180-day commitment if person remains imminently dangerous].)

The 14-day and 30-day confinements require a certification hearing before a court-appointed commissioner or hearing officer to determine whether probable cause exists for the detention unless the person has filed a habeas corpus petition seeking judicial review of the confinement. (§§ 5256, 5256.1, 5262, 5270.15, 5275, 5276; *Susan T.*, *supra*, 8 Cal.4th at p. 1009.) The confined person has a right to appointed counsel at any hearing on a habeas corpus petition. (§§ 5275, 5276.) The 180-day commitments require a trial court order following a judicial hearing at which the confined person is entitled to appointed counsel, a jury trial, proof beyond a reasonable doubt, and a unanimous verdict on whether he or she is imminently dangerous. (§§ 5301-5303; *Susan T.*, at p. 1009; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 230-233 (*Roulet*).)

The LPS Act also authorizes the trial court to appoint a conservator for a gravely disabled person (§ 5350) so that she may receive individualized treatment,

9

supervision, and placement (§ 5350.1). The proposed conservatee is entitled to appointed counsel, a jury trial, proof beyond a reasonable doubt, and a unanimous verdict on the question of whether the person is gravely disabled. (§§ 5350, subd. (d); 5365; *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 611.) Before July 1, 2012, an LPS conservator had the power to place the conservatee in a state developmental center or other locked treatment facility if the conservator determined it was the least restrictive placement.[4] (§§ 5353, 5358, 6000, subd. (a)(1); *In re Violet C.* (1989) 213 Cal.App.3d 86, 91 (*Violet C.*).) Following the recent amendments to the Welfare and Institutions Code, an LPS conservator no longer has authority to place a conservatee in a state developmental center, but the conservator retains all other powers regarding the conservatee's placement. (§§ 6000, subds. (a) & (c); 7505.) An LPS conservatorship automatically terminates after one year unless the conservator successfully petitions the court to reestablish the conservatorship. (§§ 5361-5362.)

C.      *Judicial Commitments Under Section 6500 et seq.*

Section 6500 authorizes the district attorney, or county counsel if designated by the board of supervisors, to petition the trial court for an order involuntarily committing a developmentally disabled person who is a danger to self or others. (§ 6500, subd. (b)(5).) The petition may be brought at the request of the parent, guardian, conservator, or other person charged with the support of the developmentally disabled person, the regional center director or his or her designee, or several other statutorily designated individuals.[5] (§ 6502.) The person who may be committed has a

_____

        [4]      A conservator appointed under the Probate Code lacks the authority to place the conservatee in a locked facility. (*People v. Karriker* (2007) 149 Cal.App.4th 763, 780 (*Karriker*) ["'The primary difference between a Probate Code conservator and an LPS conservator is the LPS conservator's power to place the conservatee in a locked facility, an action that a Probate Code conservator cannot take'"].)

        [5]      Section 6500 et seq. addresses not only developmentally disabled persons who are dangerous to themselves or others, but also developmentally disabled persons

10

right to appointed counsel, a jury trial, proof beyond a reasonable doubt, and a unanimous verdict regarding the petition.  (§ 6500, subd. (b)(5); *Roulet*, *supra*, 23 Cal.3d at p. 235.)

Before July 1, 2012, if the trial court found the person to be developmentally disabled and a danger to himself, herself, or others, the court could order the person committed to the State Department of Developmental Services for suitable treatment and habilitation services.  (Former § 6509; see Stats. 1996, ch. 1076, § 8.5, p. 7268.)  Former section 6509, subdivision (a), defined suitable treatment and habilitation services as the least restrictive residential placement necessary to achieve the purposes of the treatment, and included any state hospital, state developmental center, community care facility, or health facility the court found to be the most appropriate alternative following a hearing on the subject.  The commitment order automatically expired one year after it was made.  (Former § 6500; Stats. 1996, ch. 1076, § 5, p. 7265.)

Effective July 1, 2012, the trial court may not commit a dangerous, developmentally disabled person to the State Department of Developmental Services unless it also finds the person is dangerous due to an acute crisis as defined in section 4418.7.[6]  (§§ 6500, subd. (b)(1) & (2), 6509, subd. (a)(2), 7505, subd. (a)(2).)

---

who have been committed because they are incompetent to stand trial for a crime with which they are charged.  (§§ 6500, subds. (b)(1), (c)(1), 6502, 6509, subds. (a) & (b), 7505, subd. (a)(3).)  We focus on the statutory provisions relating to committing developmentally disabled persons who, like John, have not been charged with a crime or committed because they are incompetent to stand trial.

[6]  Section 4418.7, subdivision (d)(1) defines an "'acute crises'" as "a situation in which the consumer meets the criteria of Section 6500 and, as a result of the consumer's behavior, all of the following are met:  [¶]  (A)  There is imminent risk for substantial harm to self or others.  [¶]  (B)  The service and support needs of the consumer cannot be met in the community, including with supplemental services as set forth in subparagraph (E) of paragraph (9) of subdivision (a) of Section 4648 and emergency and crisis intervention services as set forth in paragraph (10) of subdivision (a) of Section 4648.  [¶]  (C)  Due to serious and potentially life-threatening conditions, the consumer requires a more restrictive environment for crisis stabilization."

11

Under the current statutory scheme, the commitment order automatically expires six months after it was made unless the trial court grants the regional center's written request to extend the commitment. The total commitment period, however, may not exceed one year. (§ 6500, subd. (c)(2).)

D.    *The* Hop *Decision*

In *Hop*, the California Supreme Court examined the constitutionality of section 4825 of the Lanterman Act, which, as explained above, allows the indefinite confinement of a developmentally disabled person in a developmental center based on a request by the person's parent or conservator, a recommendation by a regional center, and the absence of any objection from the person or her representative. (*Hop*, *supra*, 29 Cal.3d at pp. 87-88.) Irene Hop was a developmentally disabled adult without a guardian or conservator. For several years, she lived in a community-based home that met all of her needs. Hop's mother, however, transferred her to a developmental center based solely on Hop's failure to object to the transfer and the concurrence of the regional center and developmental center staff. A public defender challenged the transfer by filing a habeas corpus petition on Hop's behalf, alleging her disability prevented her from objecting and therefore the developmental center could not rely on her failure to contest the transfer. The trial court denied the petition without conducting a hearing. (*Id*. at pp. 85-86.) The Supreme Court found the trial court's refusal to hear the petition improper. The high court nonetheless denied the petition because it could not conduct the evidentiary hearing required to determine whether Hop's transfer was appropriate, but instructed the public defender to renew Hop's petition in the trial court. (*Id*. at pp. 94-95.)

The *Hop* court first examined whether a section 4825 placement in a developmental center violated a developmentally disabled person's due process rights because that provision did not require a judicial hearing on the need for the placement.

The court explained that personal liberty is a fundamental right the United States and California Constitutions guarantee to all individuals, including individuals with developmental disabilities, and placing a person in a developmental center constituted a significant restraint on the person's liberty interests. Accordingly, the *Hop* court concluded that confinement in a developmental center required application of criminal due process standards to test its validity, including a judicial hearing to determine whether the person's disabilities warranted the confinement. (*Hop*, *supra*, 29 Cal.3d at pp. 89, 92.)

The state hospital opposed a judicial hearing because persons placed in a developmental center under section 4825 are voluntary admittees who have the right to either prevent their confinement by objecting to it or terminate it by requesting to leave the center once they are admitted. (*Hop*, *supra*, 29 Cal.3d at p. 90.) The *Hop* court rejected this argument, pointing out that it only highlighted the need for a judicial hearing to test the grounds for the placement. Under the statutory scheme, developmentally disabled persons could voluntarily admit themselves to a developmental center under section 6000, subdivision (a), only if they were competent to make that decision, but developmentally disabled persons who were not competent to make that decision were nonetheless deemed to consent to placement in a developmental center under section 4825 because they failed to object and had the right to terminate the placement. (*Hop*, at pp. 90-91.) Because a person lacking competency to decide whether to seek admission also lacks competency to consent to placement in a developmental center, the *Hop* court concluded a developmentally disabled person placed in a developmental center under section 4825 "may not be deemed a 'voluntary' admittee" and therefore due process required a judicial hearing to test whether the placement was appropriate. (*Hop*, at p. 92.)

The *Hop* court also considered whether equal protection rights required a judicial hearing before a developmentally disabled person could be placed in a

13

developmental center under section 4825. The court explained that no other group of similarly situated adults in need of protective custody could be lawfully placed in a developmental center without a knowing and intelligent waiver of rights or a judicial determination that placement was appropriate, and the developmental center failed to offer any rational basis for that disparate treatment. (*Hop*, *supra*, 29 Cal.3d at p. 92.) Consequently, the *Hop* court held that a developmentally disabled person "is entitled to a judicial hearing on the question of whether, because of developmental disability she is gravely disabled or a danger to herself or others and whether placement in a state hospital [under section 4825] is warranted." (*Hop*, at p. 93.)

After comparing a proposed developmental center admittee under section 4825 to a proposed LPS conservatee and a proposed committee under section 6500 et seq., the *Hop* court concluded the proposed developmental center admittee "is entitled to the same congeries of rights" as the proposed conservatee and proposed committee. Those rights include the right to a jury trial on demand, application of the beyond a reasonable doubt standard of proof, and appointed counsel. (*Hop*, *supra*, 29 Cal.3d at pp. 93-94.)

*Hop* did not create a new nonstatutory means of involuntary judicial commitment or provide authority for confinement in a state developmental center not otherwise authorized by statute. (*Violet C*., *supra*, 213 Cal.App.3d at p. 94.) Rather, *Hop* applied constitutional safeguards to an otherwise constitutionally infirm statutory scheme and held a person placed in a state developmental center under section 4825 must receive the same constitutional safeguards as a gravely disabled person confined under the LPS Act or as a danger to herself or others under section 6500 et seq. (*Violet C*., at pp. 94-95; *Hop*, *supra*, 29 Cal.3d at pp. 92-94.)

Although *Hop* involved a developmentally disabled adult placed in a developmental center by a parent who was neither her guardian nor conservator, subsequent cases have found *Hop*'s analysis and judicial hearing requirement equally

14

applicable to state hospital placements initiated by a developmentally disabled adult's conservator. For example, in *North Bay Regional Center v. Sherry S.* (1989) 207 Cal.App.3d 449 (*Sherry S.*), the Court of Appeal explained: "The rationale of *Hop* is that a developmentally disabled adult who is putatively unable to consent to the deprivation of liberty entailed in state hospitalization cannot be so deprived without a hearing. For purposes of this rationale, we see no reason to distinguish between hospitalizations initiated by parents and those initiated by conservators."[7] (*Id.* at p. 461; see also *Violet C.*, *supra*, 213 Cal.App.3d at p. 96.)

II

FACTS AND PROCEDURAL HISTORY

John is a 57-year-old, developmentally disabled adult with an estimated IQ of 14. He suffers a wide variety of medical conditions that require around-the-clock care, including generalized nonintractable epilepsy, lipoma, osteopenia, hypothyroidism, hypertension, and coronary arteriosclerosis. John cannot communicate verbally, nor can he tell others when he is experiencing pain or needs medical attention. He is fully ambulatory, but he cannot self-administer the many daily medications he requires, nor can he provide for his basic personal needs such as food, shelter, and clothing. For his own safety, John requires close supervision because he cannot appreciate basic safety hazards.

John is the oldest of Raymond and Carol's five children. In October 1965, Raymond and Carol voluntarily admitted John to Fairview because they could not safely care for him at their home. John has continued to live at Fairview for the past 47 years.

---

[7] These cases refer to conservators appointed under the Probate Code. (See, e.g., *Violet C.*, *supra*, 213 Cal.App.3d at p. 96.) They do not apply to conservators appointed under the LPS Act because, as explained above, LPS conservators have the authority to place gravely disabled conservatees in a developmental center, but a Probate Code conservator lacks that power. (*Karriker*, *supra*, 149 Cal.App.4th at p. 780.)

Throughout John's stay at Fairview, Raymond, Carol, and their other children have remained active in his life.  Raymond and Carol visit him regularly, participate in events and activities at Fairview with him, bring him to their home for visits every few weeks, and include him in all family events and gatherings.

In 1996, the trial court appointed Raymond, Carol, and John's sister, Andrea, as limited conservators for John under the Probate Code.[8]  The court granted Petitioners the power "[t]o fix the residence or specific dwelling of [John] to include *request* for placement at a State Developmental Center," give or withhold medical consent, and contract on John's behalf.  (Italics added.)  The court has investigated and reviewed this limited conservatorship every two years, but has not found any grounds to modify or terminate it.

Since 1993 the trial court has annually reviewed John's placement at Fairview under *Hop* and section 4825.  The Harbor Regional Center initiated each of these annual "*Hop* reviews" by requesting court approval for John to remain at Fairview.  Each time the court conducted a *Hop* review, it appointed the Public Defender to serve as John's attorney and ultimately approved John's continued Fairview placement subject to "further judicial review within one (1) year."

The Harbor Regional Center filed its most recent "*Hop* petition" in September 2010, explaining "there is no known suitable, legally available placement [for John] that is less restrictive than the proposed state developmental center placement."  In response, the court again appointed the Public Defender to serve as John's attorney and temporarily approved his continued placement at Fairview pending a hearing on the *Hop* petition.

---

[8]     Raymond, Carol, and Andrea were not appointed as LPS conservators for John.

16

In December 2011, while the most recent *Hop* petition remained pending, the Public Defender filed a habeas corpus petition on John's behalf under section 4800, which provides every adult admitted to a state developmental center with the right to petition for a hearing on whether the committee should be released. The petition alleged Fairview unlawfully restrained John's liberty because it is not the least restrictive placement for him. The petition sought John's release from Fairview, but provided no information explaining why Fairview was not the least restrictive placement or where John should be placed. Petitioners opposed the petition on several grounds, including (1) the petition failed to allege any facts to support its request for relief; (2) the Public Defender lacked standing to file the petition without approval from John's conservators; (3) Fairview is the least restrictive placement for John; and (4) John's placement at Fairview should be reviewed through the *Hop* review process, not a habeas corpus petition.

In April 2012, the trial court conducted a hearing on Petitioners' challenges to the Public Defender's habeas corpus petition. At the hearing, the Harbor Regional Center informed the court it had not been "actively" pursuing an alternative placement for John, but it "believed" it could find a "suitable" placement for him if the Court ordered it to do so. The Harbor Regional Center, however, did not identify any facility other than Fairview that could properly care for John.

The trial court rejected all of Petitioners' challenges and scheduled an evidentiary hearing on the habeas corpus petition to be followed immediately by a *Hop* hearing if it remained necessary. Petitioners promptly filed the current petition for writ of mandate or prohibition in this court, seeking (1) an immediate stay of trial court proceedings that would determine John's placement, and (2) a writ directing the trial court to dismiss the Public Defender's section 4800 habeas corpus petition. We ordered the Public Defender and Harbor Regional Center to show cause why mandate should not issue, and stayed all trial court proceedings on the habeas corpus and *Hop* petitions.

17

III

DISCUSSION

A.   *The Public Defender May Not Pursue the Habeas Corpus Petition on John's Behalf*

The Public Defender filed the habeas corpus petition on John's behalf under section 4800, which provides:  "Every adult who is or has been admitted or committed to a . . . developmental center . . . as a developmentally disabled patient shall have a right to a hearing by writ of habeas corpus for his or her release from the . . . developmental center . . . after he or she or any person acting on his or her behalf makes a request for release to any member of the staff of the . . . developmental center . . . or to any employee of a regional center."  (§ 4800, subd. (a).)  The Public Defender contends it properly filed the habeas corpus petition as a "person acting on [John's] behalf."  We disagree because the Public Defender failed to establish an appropriate basis for pursuing the petition and failed to follow section 4800's statutory procedures.

In *Hop*, the Supreme Court addressed section 4800 and a public defender's standing to bring a habeas corpus petition on behalf of a developmentally disabled person who is unable to object to a developmental center placement.  The *Hop* court acknowledged section 4800 authorizes a habeas corpus petition by anyone acting on a developmentally disabled person's behalf, but the court also pointed out its habeas corpus jurisprudence allows someone other than the detained person to bring a habeas corpus petition "'[o]nly in *very exceptional circumstances*,'" and the petition must "'"set forth some reason or explanation . . . showing why the detained person [did] not sign [the petition] . . . ."'  [Citation.]"  (*Hop*, *supra*, 29 Cal.3d at pp. 86-87, original italics.)  Accordingly, although section 4800 authorizes a habeas corpus hearing, a person other than the developmentally disabled person must establish exceptional circumstances to justify pursuing a habeas corpus petition on the developmentally disabled person's behalf because "'"[i]t was not intended that the writ of habeas corpus should be availed of, as a

18

matter of course, by intruders or uninvited meddlers . . . . [Citation.] . . . .'" [Citation.]"
(*Hop*, at p. 87.)

The *Hop* court found exceptional circumstances supported the public defender's section 4800 habeas corpus petition. Those circumstances described in the petition alleged (1) Hop's disability deprived her of the "'ability to protest her transfer to a more restrictive placement'"; (2) Hop's mother initiated the developmental center placement with the concurrence of the regional center and developmental center staff, and therefore none of them reasonably could be expected to file a habeas corpus petition challenging their own actions; and (3) Hop appeared incompetent to initiate or file a habeas corpus proceeding on her own behalf. (*Hop*, *supra*, 29 Cal.3d at p. 87.) In essence, no means existed for Hop to challenge her transfer to the state hospital other than the public defender's habeas corpus petition filed on her behalf.

The Supreme Court also has long recognized "habeas corpus is an extraordinary remedy that 'was not created for the purpose of defeating or embarrassing justice, but to promote it' [citation.] . . . ." (*In re Robbins* (1998) 18 Cal.4th 770, 777-778.) Indeed, habeas corpus is not a proper remedy where other adequate remedies exist, such as an appeal or other available procedures for challenging the confinement. (*Gandolfo*, *supra*, 36 Cal.3d at pp. 898-899.) In *Gandolfo*, the Supreme Court held a habeas corpus petition was not an appropriate means to challenge an LPS conservatee's confinement in a developmental center because the LPS Act provided ample means for the conservatee to challenge both the conservatorship and his developmental center confinement, and the habeas corpus petition did not allege any extraordinary circumstances rendering those procedures inadequate. (*Id.* at pp. 897-900.)

Here, the record shows there are no exceptional circumstances that justify the Public Defender filing the habeas corpus petition on John's behalf or show the remedies otherwise available to address John's Fairview placement are inadequate. Unlike the situation in *Hop*, we are not concerned with John's initial placement at

19

Fairview for an indefinite period of time without a judicial hearing. John has lived at Fairview for more than 47 years. Since at least 1993, John has been placed at Fairview under a series of one-year placements subject to annual judicial reviews. The most recent of these *Hop* reviews was pending and set for hearing when the Public Defender filed the habeas corpus petition. As explained above, the *Hop* review process assures John not only representation by counsel but also a jury trial and application of the beyond reasonable doubt standard of proof on the scope of his disabilities and whether his disabilities warrant his developmental center placement. The Public Defender provides no explanation why the pending *Hop* review is an inadequate means for evaluating John's Fairview placement.

To the contrary, the Public Defender suggested a habeas corpus petition under section 4800 provides a means to circumvent the *Hop* review process. The Public Defender argued in the trial court that section 4800 authorized it to file the habeas corpus petition and allow the trial court to decide whether John's Fairview placement remained appropriate, rather than go through the *Hop* review process and present that issue to a jury. This argument turns the function and purpose of habeas corpus on its head. As explained above, habeas corpus is appropriate only when there are no other available and adequate remedies; it may not be used to avoid otherwise available and adequate remedies.[9] (*Gandolfo*, *supra*, 36 Cal.3d at pp. 898-899.)

Moreover, unlike *Hop*, John has court-appointed conservators who are authorized to act on his behalf in selecting his residence. (See *Michael K.*, *supra*, 185 Cal.App.4th at p. 1128, fn. 14 [exceptional circumstances did not exist to allow

_____

[9] We do not suggest that a developmentally disabled person or anyone acting on his or her behalf must always await the next *Hop* review to challenge the person's placement in a state developmental center or other facility. Rather, we simply conclude a section 4800 habeas corpus petition may not be used when there are other adequate and available remedies for challenging the placement. Here, the *Hop* review process was adequate because it was already underway and a hearing was scheduled.

public defender to pursue section 4800 habeas corpus petition because developmentally disabled person had court-appointed conservators who were competent and authorized to decide whether the person should remain in a state developmental center].)  The Public Defender and Harbor Regional Center contend there is evidence that John's conservators are preventing the Harbor Regional Center from determining whether there is a less restrictive placement that would meet John's needs, and therefore we may not rely on the conservators' involvement to conclude the Public Defender lacks authority to pursue the habeas corpus petition.  We disagree.

Neither the Public Defender nor Harbor Regional Center cites any evidence in the record showing John's conservators prevented the regional center from fully assessing John and his needs or otherwise identifying any less restrictive placements.  The Harbor Regional Center argues it cannot identify other possible placements for John without his conservators' cooperation because it may not disclose confidential information about John to potential service providers without their consent.  (See generally § 4514.)  But section 4514 includes numerous exceptions to the consent requirement, including disclosure to "qualified professional persons . . . in the provision of intake, assessment, and services or appropriate referrals."  (§ 4514, subd. (a).)  Consent is required only when disclosure is made to "a program not vendored by a regional center or developmental center."  (*Ibid*.)  The Harbor Regional Center cites no evidence showing John's conservators can or have thwarted the placement process through lack of cooperation.

We do not suggest that a Probate Code conservator's involvement in a developmentally disabled person's placement bars a public defender from pursuing a habeas corpus petition on the person's behalf whenever the conservator objects.  Rather, we merely conclude the conservator's involvement is *a* factor the court may consider in determining whether exceptional circumstances justified the public defender's section 4800 habeas corpus petition.  (See *Michael K.*, *supra*, 185 Cal.App.4th at p. 1123,

21

fn. 8 [public defender may act contrary to conservator's instructions in extraordinary circumstances].) For example, if there was evidence showing the conservator failed to act in the developmentally disabled person's best interests or prevented a proper assessment or identification of possible community-based services, the court could consider those circumstances in deciding whether exceptional circumstances exist. Here, the Public Defender failed to show either extraordinary circumstances or that other remedies were inadequate.

The Public Defender also may not pursue the current habeas corpus petition because he failed to follow the procedures mandated for a section 4800 habeas corpus petition. Section 4800, subdivision (a), grants every adult admitted or confined in a state developmental center or other identified facility the right to a habeas corpus hearing *after* the adult or someone acting on his or her behalf makes a request for release to a facility staff member or a regional center employee. Upon receiving the request, the staff member or regional center employee must promptly (1) provide the person making the request a written request for release form for the person to sign,[10] and (2) deliver a copy of the signed request to the director or administrator of the facility from which release is sought. (§ 4800, subd. (b).) The director or administrator must then notify the trial court of the request and transmit a copy to the adult's parent or conservator. (*Ibid.*) The adult or person acting on his or her behalf must then prepare and file a habeas corpus petition with the court, and counsel must be appointed to assist the adult if he does not already have counsel. (§ 4801, subds. (a) & (b).) Here, the Public Defender failed to request John's release to any Fairview staff member or regional center employee and no written request was submitted to anyone at Fairview or the regional center. Instead, the Public Defender bypassed the statute's preliminary steps and simply filed the habeas corpus

---

[10] The written request for release must be substantially in the form described in section 4800, subdivision (d).

22

petition with the trial court.  The Public Defender provides no authority or excuse justifying its failure to follow the statutory procedures.  (See *Sherry S.*, *supra*, 207 Cal.App.3d at p. 461 [statutory procedures regarding developmental center placements under section 4825 must be followed].)

The Public Defender argues section 4800 and *Hop* authorize it to file a habeas corpus petition any time a developmentally disabled person placed in a state developmental center or other facility is incapable of filing a petition on her own behalf. The Public Defender reads these authorities too broadly.  As explained above, *Hop* authorized a public defender to pursue a habeas corpus petition on Hop's behalf because there was no one else to do so and no other means to obtain an independent review of Hop's state hospital placement.  At the time, the right to a judicial hearing or any other remedy did not exist.  *Hop* nonetheless requires "'*very exceptional circumstances*'" for a public defender or anyone other than the detained person to file a section 4800 habeas corpus petition, and the writ petition must allege facts establishing those circumstances. (*Hop*, *supra*, 29 Cal.3d at pp. 86-87, original italics.)  A public defender simply may not pursue a section 4800 habeas corpus petition as a matter of course.

The Public Defender contends *In re Borgogna* (1981) 121 Cal.App.3d 937, supports its interpretation of section 4800 and *Hop*.  *Borgogna* declared a public defender has standing to pursue a habeas corpus petition on a developmentally disabled person's behalf if the person is not competent to do so.  (*Borgogna*, at p. 945.)  This statement, however, is dicta.  (*Ibid*.)  In *Borgogna*, the public defender joined with the regional center in bringing an earlier habeas corpus petition, but the trial court denied the petition because it was not filed by the developmentally disabled person, who was competent and opposed the petition.  The issue in *Borgogna* concerned a later petition the regional center filed on its own in the Court of Appeal.  (*Borgogna*, at p. 940.)  The *Borgogna* court found the regional center could pursue the petition because the statutory scheme vested it with authority to decide the disabled person's placement and therefore the center

23

could defend its own placement decision. The *Borgogna* court did not analyze or consider the public defender's authority to pursue a habeas corpus petition nor did it discuss *Hop*'s very exceptional circumstances requirement. (*Id*. at p. 946.) An opinion is not authority for issues it did not consider or decide. (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155; *People v. Dunbar* (2012) 209 Cal.App.4th 114, 118.) We therefore find *Borgogna* inapplicable.

We note the trial court appointed the Public Defender to serve as John's counsel for the pending *Hop* review. Assuming that appointment would otherwise authorize the Public Defender to file a habeas corpus petition on John's behalf, it does not authorize the Public Defender to pursue the current petition. As explained above, the record does not show the pending *Hop* review is an inadequate remedy for testing the validity of John's placement at Fairview and the Public Defender failed to follow the appropriate procedures for pursuing a habeas corpus petition under section 4800. Accordingly, the Public Defender may not pursue the current habeas corpus petition on John's behalf.

B.      *The Trial Court Retains Jurisdiction to Review John's Fairview Placement*

Petitioners contend the trial court lacks jurisdiction to conduct *Hop* hearings to review John's ongoing Fairview placement because the *Hop* decision did not create ongoing jurisdiction for the trial court to hear challenges to placement decisions or otherwise review existing placements. According to Petitioners, the Lanterman Act's fair hearing process is the exclusive means for deciding challenges concerning John's Fairview placement. This argument fails because it ignores the terms of the court orders approving John's placement at Fairview and the limited purpose of periodic *Hop* reviews.[11]

---

[11]      Although Petitioners argue the trial court lacks authority to conduct periodic *Hop* reviews regarding John's Fairview placement, they do not seek any relief

24

*Hop* held a developmentally disabled person's due process and equal protection rights prohibit the person from being confined in a state developmental center under section 4825 without an initial judicial determination regarding the person's disability and whether the placement was warranted. (*Hop*, *supra*, 29 Cal.3d at pp. 92-93.) The fact John was placed in Fairview several years before the Supreme Court announced its *Hop* decision in no way affects his right to have his Fairview placement reviewed under the standards *Hop* established. As the *Hop* court pointed out, its requirement of a hearing and other procedural rights it established to make a developmental center placement under section 4825 constitutional applied not only to Hop and all developmentally disabled persons placed in a developmental center after the *Hop* decision, but also to all persons who resided in a developmental center under a section 4825 placement when the Supreme Court announced its decision. (*Hop*, at p. 94 ["Our holding does not require the immediate release either of Hop or of those presently held in state hospitals under the authority of section 4825"].)

Here, the initial judicial determination regarding John's Fairview placement occurred in 1993. At that time, the trial court approved John's placement subject to "further judicial review within one (1) year." Since then, John has remained at Fairview under a series of court orders approving his placement subject to annual judicial reviews. Every court order approving the placement reserved jurisdiction for the court to do so. Indeed, each time John's Fairview placement came up for review, it was essentially a new placement requiring judicial review under *Hop* regardless of whether the trial court had continuing jurisdiction because the authorization for the previous placement had expired. No one disputes the trial court's authority to approve John's Fairview placement

on the pending *Hop* petition nor do they ask us to prevent the trial court from reviewing John's Fairview placement.

25

for a limited time subject to further judicial review, and therefore this challenge to the trial court's jurisdiction to review the placement fails.

We nonetheless consider whether *Hop* itself provides the trial court with authority to periodically review John's placement to determine whether his disabilities continue to justify placement in a developmental center. Although *Hop* addressed only a developmentally disabled person's initial placement, we find its rationale for requiring judicial review equally applicable to the committee's ongoing placement. As explained above, *Hop* found a developmentally disabled person's initial placement without a judicial hearing violated the person's due process and equal protection rights because it significantly impairs the person's fundamental right to personal liberty, and no other class of similarly situated adults may be placed in a developmental center without a judicial determination that the placement is appropriate. (*Hop*, *supra*, 29 Cal.3d at pp. 89-92.)

The impairment of the committee's personal liberty is not diminished by residing in the developmental center for an extended period of time, especially when there are continuing advancements in both the treatment of numerous disabilities and the availability of less restrictive services in community-based and other facilities. No other class of similarly situated adults may lawfully remain in a state developmental center indefinitely without further judicial review of their ongoing placement. For example, the LPS Act and section 6500 et seq. place limits on the length of confinement for a gravely disabled person or a person believed to be a danger to self or others, and both statutory schemes also require judicial review to recommit the person or extend the initial confinement. (See, e.g., §§ 5150, 5250, 5260, 5270.15, 5300, 5304, subd. (b) [limiting LPS confinements to 72 hours, 14 days, 30 days, or 180 days depending on person's condition]; §§ 5256, 5256.1, 5262, 5270.15, 5275, 5276, 5301, 5302, 5303 [requiring a court or certified hearing officer to review all LPS confinements except initial 72-hour confinement and all extensions or recommitments]; §§ 6500, subd. (c)(2), 6502, 6503

26

[limiting commitments to six months and requiring judicial hearing for initial commitment and any extension or recommitment].)

The Lanterman Act does not limit the length of a section 4825 placement or require judicial review of the placement. Accordingly, unless *Hop* requires a further judicial review of a section 4825 placement, John and others similarly situated could face a lifetime placement in a developmental center based solely on an initial judicial determination regarding the placement's suitability. We see no basis to justify the lifetime placement of a nondangerous developmentally disabled person under section 4825 based solely on an initial judicial review. Petitioners do not adequately explain why the Legislature under the LPS Act and section 6500 et seq. limited the commitment time of a dangerous developmentally disabled person or a gravely disabled person placed in a developmental center and also guaranteed those individuals further judicial review, but omitted those protections for section 4825 placements. That result is simply inconsistent with the constitutional principles articulated in *Hop*.[12]

Petitioners contend John and other developmentally disabled persons placed in a developmental center are not similarly situated to other developmental center residents because section 4825 admittees voluntarily agree to the placement. According to Petitioners, persons placed under section 4825 are free to leave the developmental center any time they or their legal representatives choose, unlike those persons placed under the LPS Act, section 6500 et seq., or other statutory provisions. *Hop*, however, rejected this identical argument. As explained above, *Hop* found developmentally disabled persons are incapable of objecting to their placement because of their disability

_____

[12] The Public Defender requests that we judicially notice a document published by the Office of the Legislative Analyst in November 1988 entitled, "Judicial Reviews of State Developmental Center Placements; *Implementation of the In re Hop Decision*." We deny the request because a 25-year-old document on how various counties implemented *Hop* is not relevant to our current inquiry. (*Mangini*, *supra*, 7 Cal.4th at p. 1063.)

27

and therefore are not voluntary admittees. A person may not be considered a voluntary admittee under section 4825 unless he or she is competent to request or consent to the placement. (*Hop*, *supra*, 29 Cal.3d at pp. 90-92.) Appointing a conservator for the developmentally disabled person does not change that conclusion; the placement remains involuntary and a judicial hearing is required. (*Sherry S.*, *supra*, 207 Cal.App.3d at p. 461; *Violet C.*, *supra*, 213 Cal.App.3d at p. 96.) As *Hop* explained, the well intentioned efforts of a person's representative to act in the person's best interests "'cannot . . . detract in any way from [the person's] right to procedures that will protect him from arbitrary curtailment of his liberty interest . . . .' [Citations.]" (*Hop*, at p. 93; see also *Capitol People*, *supra*, 155 Cal.App.4th at p. 699 ["under the Lanterman Act it is the individual with a developmental disability—not his or her family, friends, or conservator—who is afforded all the legal rights and responsibilities guaranteed by the United States and California Constitutions. [Citation.] No matter how well intentioned parents and conservators may be, they cannot exert their influence to curtail or deny the due process rights of persons with developmental disabilities"].)

We acknowledge *Michael K.* and *Whitley* concluded *Hop* did not provide "ongoing jurisdiction in the superior court to hear challenges to placement decisions or simply review existing placements," explaining that "'[t]he due process concerns for retention in a development[al] center are not the same due process concerns that are present when a developmentally disabled individual is first involuntarily committed.'" (*Michael K.*, *supra*, 185 Cal.App.4th at pp. 1127-1129; *Whitley*, *supra*, 155 Cal.App.4th at pp. 1465-1466.) As authority for that proposition, *Michael K.* and *Whitley* cite *Cramer v. Gillermina R.* (1981) 125 Cal.App.3d 380, 393 (*Cramer*), without any analysis of that decision. Upon examination, *Cramer* does not support their conclusion.

*Cramer* involved petitions to recommit several individuals to a state developmental center because the original orders committing them under section 6500 et seq. were expiring. Following ex parte hearings on each petition, the trial court

28

temporarily extended the commitment orders pending full recommitment hearings. The committees challenged these temporary extensions, arguing they were constitutionally entitled to adversarial probable cause hearings before they could be temporarily held beyond their original commitments. (*Cramer*, *supra*, 125 Cal.App.3d at pp. 384-385, 392.) The committees cited *Hop* to support their position, but *Cramer* found *Hop* inapplicable because it did not address due process concerns arising from a recommitment under section 6500 et seq. (*Cramer*, at p. 393.)

*Cramer* is inapplicable here for the same reason—it addresses a different type of confinement based on different authority. At the time, section 6500 et seq. authorized a one-year judicial commitment for developmentally disabled persons who were a danger to themselves or others. After one year, the commitment order automatically expired and the committee would be freed unless the district attorney petitioned for a recommitment order. Without periodic *Hop* reviews a developmentally disabled person could be placed in a developmental center under section 4825 for the remainder of her life based only on an initial judicial review. Consequently, *Cramer* does not support the conclusion that the due process concerns regarding retention in a state developmental center under section 4825 are different than the due process concerns regarding the initial section 4825 placement.

Moreover, in *Cramer*, the individuals received judicial hearings *before* the court made the temporary hold orders and the individuals were entitled to appear at those hearings and oppose the orders. Those hearings were not full adversarial hearings with the right of cross-examination and other formal hearing rights, but they were judicial hearings addressing the suitability of the temporary hold orders. (*Cramer*, *supra*, 125 Cal.App.3d at pp. 392-393.) The *Cramer* court also emphasized that the challenged orders were merely temporary pending a full judicial hearing where the committee would receive all formal hearing rights: "Undoubtedly, our holding would be different if there were no available subsequent judicial hearing to test the recommitment." (*Id*. at p. 392.)

29

Accordingly, *Cramer* held due process requires a judicial hearing before a recommitment and therefore does not support the conclusion the trial court has no ongoing jurisdiction to review a section 4825 placement after the court initially approves the placement.

We note two additional reasons why *Michael K.* and *Whitley* do not deprive the trial court of jurisdiction to conduct periodic *Hop* reviews. First, neither decision addressed *Hop*'s equal protection rationale for requiring ongoing jurisdiction to review a developmental center placement. Second, neither decision involved a periodic *Hop* review regarding an ongoing developmental center placement. Instead, both *Michael K.* and *Whitley* involved attempts to circumvent the Lanterman Act's administrative fair hearing procedures by arguing *Hop* created ongoing jurisdiction for courts to hear challenges to specific placement decisions or otherwise review all aspects of any Lanterman Act placement. (*Michael K.*, *supra*, 185 Cal.App.4th at pp. 1116-1117, 1127; *Whitley*, *supra*, 155 Cal.App.4th at p. 1465.)

Our reading of *Hop* is not inconsistent with *Michael K.*'s and *Whitley*'s conclusion that *Hop* does not provide the trial court with ongoing jurisdiction to hear challenges to specific placement decisions and review *all* aspects of existing placements. We read *Hop* simply to confer jurisdiction on the trial court to (1) conduct a hearing regarding the basis for initially placing a developmentally disabled person in a developmental center, and (2) periodically review whether the person's disabilities continue to support the significant restrictions the placement imposes on the committee's liberty interests. This jurisdiction to periodically review the basis for a developmental center placement is not jurisdiction to monitor the ongoing placement or make decisions regarding the details of the services the developmentally disabled person receives.[13]

---

[13] Neither the parties nor the amici curiae briefed what constitutes the appropriate interval between *Hop* reviews and that issue is not presented here because each order approving John's Fairview placement specifically required the next review to occur within one year. Accordingly, we do not address the issue. We also note the recent amendments to the Welfare and Institutions Code will reduce and eventually eliminate

Indeed, we emphasize *Hop* did not create a new procedure for placing a developmentally disabled person in a developmental center, nor did it create a nonstatutory procedure for challenging decisions regarding a developmentally disabled person's placement or other specific services. (*Violet C.*, *supra*, 213 Cal.App.3d at p. 94.) Instead, *Hop* imposed limits on an existing statutory procedure for placing a developmentally disabled person in a developmental center to ensure the restraint imposed on the disabled person's liberty interests did not violate the person's due process and equal protection rights. (*Sherry S.*, *supra*, 207 Cal.App.4th at p. 460, fn. 11; *Violet C.*, *supra*, 213 Cal.App.3d at pp. 94-95.) Accordingly, a *Hop* review only examines the level of confinement by asking whether the developmentally disabled person's disabilities warrant placement in the most restrictive type of facility available under the Lanterman Act. *Hop* does not apply to placement in a developmental center under any statutory provision other than section 4825, nor does it apply to placement in any facility other than a developmental center.[14]

the need for *Hop* reviews for two reasons. First, a developmentally disabled person may no longer be placed in a developmental center under section 4825 and that is the only type of placement to which *Hop* applies. (§ 7505.) Second, the recent amendments require regional centers to conduct regular, comprehensive reviews of developmentally disabled persons who resided in developmental centers before the amendments to identify community-based services that could meet the developmentally disabled person's needs. (§ 4418.25, subd. (c)(2).)

[14] The Public Defender argues the recent amendments to the Welfare and Institutions Code codified *Hop* hearings and therefore it is irrelevant whether *Hop* itself provided the superior court with ongoing jurisdiction to review state developmental center placements. The Public Defender relies on section 6500, subdivision (b)(4), which states, "In the event subsequent petitions are filed with respect to a resident of a state developmental center or a state-operated community facility committed prior to July 1, 2012, the procedures followed and criteria for recommitment shall be the same as with the initial petition for commitment." The Public Defender misreads this statute.

Section 6500 is part of the statutory scheme for committing developmentally disabled persons who are dangerous to themselves or others. It is not part of the Lanterman Act and does not address a developmental center placement under

31

The Lanterman Act's administrative fair hearing procedures allow a developmentally disabled person to challenge any specific decision a regional center or developmental center makes to reduce, terminate, change, or deny that person services. (§§ 4706, 4710.) To challenge a decision the developmentally disabled person must invoke the fair hearing procedures within 30 days of receiving notice of the challenged decision. (§4710.5, subd. (a); *Whitley*, *supra*, 155 Cal.App.4th at p. 1460.) The fair hearing procedure's final outcome may be judicially reviewed through a writ of administrative mandamus. (See *Michael K.*, *supra*, 185 Cal.App.4th at p. 1126.)

In *Whitley*, the Court of Appeal held the fair hearing procedures provide the exclusive remedy for a developmentally disabled person's legal representative to object to a community placement decision.[15] (*Whitley*, *supra*, 155 Cal.App.4th at pp. 1462-1463, 1465.) The *Whitley* court reached that conclusion based on the exhaustion of administrative remedies doctrine. (*Id*. at pp. 1463-1464.) That doctrine provides that when the Legislature creates an administrative tribunal to adjudicate an issue before presenting it to the trial court, the party must first pursue its remedies with that tribunal because the issue falls within the administrative tribunal's special jurisdiction. Consequently, the courts may only "'*review*'" the tribunal's final determination. (*Id*. at p. 1464, original italics.)

---

section 4825, which is the only developmental center placement to which *Hop* applies. Moreover, following the recent amendments, developmentally disabled persons no longer may be placed in a developmental center under section 4825 (see § 7505), and therefore there are no statutory procedures and criteria for initially placing a developmentally disabled person in a developmental center under section 4825, in contrast to a placement under section 6500 et seq.

[15] *Whitley*'s holding, however, must be qualified because, as *Hop* explained, section 4800 allows a developmentally disabled person or someone acting on his or her behalf to challenge the person's placement in exceptional circumstances and when the fair hearing procedure's remedies are inadequate. (*Hop*, *supra*, 29 Cal.3d at pp. 86-87; see also *Gandolfo*, *supra*, 36 Cal.3d at p. 898-900.) *Whitley* did not address section 4800.

32

Contrary to Petitioners' contention, the administrative fair hearing procedures do not deprive the trial court of jurisdiction to conduct periodic *Hop* reviews because the reviews serve a different purpose and are not within an administrative tribunal's special jurisdiction. *Hop* requires periodic independent reviews to ensure a section 4825 developmental center placement does not violate a developmentally disabled person's constitutional rights. The reviews ensure the person's disabilities continue to warrant placement in the most restrictive environment available under the Lanterman Act. In contrast, the fair hearing procedures provide an administrative process for a developmentally disabled person or her representative to challenge a regional center's or developmental center's decision to change the person's placement or other services. Through the process, a mediator or hearing officer with subject matter expertise resolves specific challenges to a decision changing the services the developmentally disabled person receives.

Moreover, the administrative procedures do not provide the same due process and equal protection safeguards as periodic *Hop* reviews. To protect a developmentally disabled person's personal liberty interests, *Hop* requires periodic independent reviews to ensure the person's disabilities continue to warrant developmental center placement even if there has been no change in the person's placement or other services since the last review. *Hop* requires these reviews to prevent the developmentally disabled person's representative, the regional center, and the developmental center from maintaining the placement indefinitely without any independent review. The administrative hearing procedures, however, provide for an independent administrative review only if a developmentally disabled person or her representative requests a hearing within 30 days after receiving notice of the regional center's or developmental center's decision to change the person's placement or other services. Even after the fair hearing procedures have been invoked, the developmentally disabled person's representative, the regional center, and developmental center may avoid a hearing by invoking the informal

33

meeting and voluntary mediation provisions of the administrative hearing procedures to reach an agreement to maintain the developmental center placement. That is precisely the situation *Hop* sought to avoid by imposing its judicial hearing requirement. Here, the fair hearing procedures did not provide John the due process and equal protection safeguards *Hop* requires because neither the regional center nor the developmental center changed John's placement or any of his other services, and therefore neither John nor Petitioners had the right to request a hearing under the administrative fair hearing procedures.[16]

Accordingly, the trial court may proceed with the pending *Hop* review hearing to determine whether John's disabilities continue to justify his placement in a developmental center. If the trial court determines John's Fairview placement is no longer warranted because a less restrictive facility can meet his needs, Petitioners may request John's transfer to a specific facility of their choosing and urge the adoption of the services they believe are necessary. The administrative fair hearing procedures should be used to resolve any challenges Petitioners have to the facility the regional center ultimately may select for John and the services to be provided at that facility. The trial court should not resolve any such disputes in the first instance during the *Hop* review. The *Hop* review should be limited to deciding whether appropriate efforts have been made to identify a less restrictive facility that satisfies all of John's needs and whether at least one such facility exists. Assuming the trial court concludes John should be transferred, he should not be transferred until all issues regarding his new placement are resolved. (See *Hop*, *supra*, 29 Cal.3d at p. 94 ["'A precipitous release of these [adults] to families and community facilities unprepared to care for them could be both disruptive to

_____

[16] Because neither the Harbor Regional Center nor Fairview made any decision that would have allowed John or Petitioners to invoke the administrative fair hearing procedures, we need not decide whether these administrative procedures would satisfy *Hop* if there was an administrative hearing before an independent hearing officer.

34

the treatment program and potentially harmful to the [patient] and the community'"];
see also *Sherry S.*, *supra*, 207 Cal.App.3d at p. 463.)

Our decision solely addresses the procedures relating to the *Hop* review of John's Fairview placement.  We express no opinion on the appropriate placement for John.  We also do not decide what role the Public Defender may play in the *Hop* review of John's placement, nor do we decide whether the Public Defender has adequately represented John's interests.  Our decision in *Michelle K. v. Superior Court* (Nov. 8, 2013, G048018) ___ Cal.App.4th ___ <http:www.courtinfo.ca.gov/opinions>, however, addresses those issues.

IV

DISPOSITION

The petition is granted.  Let a writ of mandate issue directing the trial court to (1) enter an order dismissing the habeas corpus petition, and (2) conduct a hearing on the *Hop* petition.  Our order staying all trial court proceedings on the habeas corpus and *Hop* petitions is hereby dissolved.  In the interest of justice, all parties shall bear their own costs on this writ proceeding.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.


35